MERCHANTS NATIONAL BANK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8179. Promulgated April 30, 1927.

1. Where a bank keeps its books of account on the cash receipts and disbursements basis, except as to interest on securities owned, it will not be allowed to report interest on securities owned on the accrual basis, even though its books have been so kept over a long period of years.

2. Value of good will determined.

*H. A. Mihills, C. P. A.,* for the petitioner.
*Chas. H. Curl, Esq.,* for the respondent.

This proceeding involves a deficiency for the calendar year 1920 in the amount of $7,454.91. The sixty-day notice, notifying the

petitioner of the deficiency for 1920, showed an overassessment for 1919, and that year will be considered only in so far as it may affect 1920.

The errors assigned by the petitioner follow:

(1) The Commissioner erroneously eliminated from taxable income as shown by the books, the interest which had been accrued on securities owned, and included in lieu thereof interest received on securities owned.

(2) The Commissioner erroneously excluded from invested capital the amount of $294,254.64 representing good will of the First National Bank acquired by the petitioner for cash on September 9, 1916.

### FINDINGS OF FACT.

The petitioner is a national bank with principal office in Baltimore, Md., and is a successor to the Merchants-Mechanics National Bank.

The books of the petitioner have been kept upon the basis of cash received and disbursed, with the exception of interest on securities owned in respect of which the accrual basis has been used. This method was followed not only for the year 1920, but also for many years prior thereto. The petitioner filed its income and profits-tax return for 1920 on the basis on which its books were kept. In the audit of the return, the Commissioner eliminated from taxable income as shown by the return the interest which had been accrued on securities owned and substituted therefor interest received on such securities.

The facts with respect to the second issue are somewhat complicated and are, therefore, set out in some detail.

Prior to July, 1916, the officers of the Merchants-Mechanics National Bank and the First National Bank had been considering plans by which the two banks would unite. Finally on July 16, 1916, the following plan of merger was prepared in a circular mailed to all stockholders:

The Merchants-Mechanics National Bank of Baltimore and the First National Bank of Baltimore are to be merged in accordance with the following plan:

(1) NAME. The name of the Bank resulting from the merger shall be the "Merchants-Mechanics First National Bank of Baltimore", or such other name as may be approved by a majority of the Directors of each of the two Banks.

(2) TERMS OF MERGER. The merger will be effected as follows:

(a) The Merchants-Mechanics National Bank will increase its capital stock from $2,000,000 to $2,500,000 and dispose of the increase in accordance with the plan;

(b) The Merchants-Mechanics National Bank will acquire by purchase or otherwise all of the assets (save the retained assets hereinafter mentioned) and assume all the liabilities of the First National Bank;

(c) The First National Bank will retain for the benefit of its stockholders the Bank Building and approximately $75,000 face amount of commercial paper to be designated by the Merchants-Mechanics National Bank, subject to the payment to the latter Bank of $95,000. The retained assets shall be disposed of in such manner as the First National Bank or its liquidating committee may determine, and may be transferred to a new corporation or to a trustee, or otherwise, and the stock of such corporation or certificates of beneficial interest therein, or other evidences of their interest, distributed to the stockholders of the First National Bank.

(3) RIGHTS AND PRIVILEGES OF STOCKHOLDERS. Merchants-Mechanics National Bank Stockholders to retain their present holdings without change. On completion of the merger and when called for by the Directors, certificates of stock must be exchanged for new certificates.

The stockholders of the Merchants-Mechanics National Bank have the right in proportion to their holdings to participate in a syndicate to underwrite the increased issue of stock, and to purchase and sell such part as may not be required for delivery to the stockholders of the First National Bank, as hereinafter mentioned.

First National Bank stockholders receive for each share held by them—

(a) $140 per share in cash, or at their option in lieu of each, 5 shares of the capital stock of the Merchants-Mechanics National Bank of Baltimore;

(b) Certificates representing the interest in the retained assets, subject to the obligations stated.

(4) DEPOSIT OF STOCK OF FIRST NATIONAL BANK. Stockholders of the First National Bank approving of the plan must deposit their shares, endorsed so as to be negotiable by delivery, with H. B. Wilcox, Blanchard Randall and E. Asbury Davis at the First National Bank, on or before the 25th day of August, 1916, or such other date as said Committee may fix.

Receipts or certificates shall be issued by said Committee by its agent for said deposited shares in such form as they may prescribe. On completion of the merger, the liquidation of the First National Bank, and on due surrender of the deposit certificates, stockholders will be entitled to receive the stipulated amount of cash or shares of stock in the merged bank in accordance with their election, together with the certificate or other evidence of their interest in the retained assets.

First National Bank stockholders must elect whether they will accept $140 cash or said 5 shares of stock by delivering such election in writing to the said H. B. Wilcox et al., Committee, on or before the 25th day of August, 1916. Each stockholder failing to file such election shall be deemed to have elected to take cash.

The said Committee, in order to effect said merger, are authorized to have said shares registered in such name as they may determine, give proxies to vote said shares and to receive and receipt for dividends in liquidation thereon, and to surrender said shares for cancellation to the First National Bank or its liquidating committee; use the shares of the stockholders who elect to take stock in the Merchants-Mechanics National Bank, or the dividend thereon or the proceeds thereof to acquire said shares and make such agreement as may be necessary for that purpose; and generally exercise all powers of ownership to such extent as, in their judgment may be necessary or expedient to carry. out the plan.

(5) UNDERWRITING SYNDICATE AND RIGHT TO PARTICIPATE. At the request of the officers of both Banks, Alexander Brown & Sons have undertaken to form a syndicate for the purchase of the entire increased issue of 50,000 shares of the Merchants-Mechanics First National Bank, $28. per share, and to exchange

79705°—28——74

and resell the same. The aggregate of the syndicate subscriptions will be $1,400,000.

The shares necessary to make delivery to the First National Bank stockholders who elect to take the stock in place of $140 cash, will be delivered to them and the balance held and disposed of for the account of the syndicate participants.

The syndicate will receive from the Merchants-Mechanics National Bank a commission of 1½% on the face amount of the subscription of $1,400,000.

SYNDICATE PARTICIPANTS. To insure the completion of the syndicate in the event of the failure of the stockholders to subscribe for the total amount of the new stock, a number of Directors have expressed their willingness to become participants. Each Director of the two Banks is entitled to subscribe to his proportionate share of the total subscription; the share of each is $42,420. No Director is obliged to subscribe. Directors' subscriptions must be made as and within the time hereinafter provided for, otherwise their right will lapse.

Any portion of the total subscription not taken by the directors may be taken by Alexander Brown and Sons, or any other persons or corporations they may select. All subscriptions are subject to reduction to the extent of the subscription to the syndicate made by the stockholders of the Merchants-Mechanics National Bank, and such subscriptions shall after reduction be treated as if originally made for the reduced amount.

STOCKHOLDERS' PARTICIPATION. Each stockholder of the Merchants-Mechanics National Bank, shall have the preferential right to become a participant in the syndicate in proportion to his holdings, i. e., one share of new stock for each four shares held by him at $28.00 per share; fractional shares to be disregarded.

All subscriptions must be made in the form prescribed by the Syndicate Managers and delivered at the Merchants-Mechanics National Bank not later than the 25th day of August, 1916, otherwise the right to subscribe will lapse.

PARTICIPANTS' OBLIGATIONS. Each syndicate participant must pay the amount of his subscription, if and when it is called for by the Syndicate Managers. The Managers are authorized on behalf of the syndicate participants to purchase and subscribe for said increased issue of stock and to pay therefor. The Managers are authorized, in lieu of calling for subscriptions, to borrow the money necessary for the payment of said shares, and to pledge in the usual form said shares and the subscribers' obligation with itself or any other firm or corporation as security therefor; to sell the shares not necessary for delivery to the First National Bank stockholders at public or private sale and at such prices as the Managers may fix; to buy and sell shares of either Bank for the account of the syndicate; to employ brokers and agents for the sale of the stock and fix the commission therefor.

The separate subscriptions of participants to the syndicate herein referred to shall constitute them members of the syndicate and together constitute the agreement between the subscribers and with the Managers. The obligation of each subscriber is a separate obligation for the amount of his subscription. No subscriber shall be liable for the default of any other.

The syndicate shall terminate on the 31st day of December, 1916, unless extended by the Managers for such period as such firm may fix, not exceeding six months, or unless earlier terminated by the Managers.

In case for any reason the merger plan or the syndicate should be abandoned, then the stock deposited or money paid shall be returned and the Managers and Syndicate Members discharged from all liability.

On the termination of the syndicate and on the payment of all of the subscribers' obligations as participants therein all of the profits of the syndicate,

together with any shares of stock remaining unsold, shall be distributed among the syndicate participants in proportion to their interests.

The Syndicate Managers are paid for their services of drafting plans for conducting the plan of merger, for conducting negotiations thereto, and therefore make no charge for their services as Syndicate Managers. They shall be entitled to be reimbursed for all their expense, including counsel fees, brokerage commissions, and all other usual expenses.

The Syndicate Managers shall not be responsible for the completion of the underwriting or otherwise with respect thereto, except for the exercise of good faith in their efforts to consummate the merger.

The foregoing is the correct official statement of the merger plan.

Douglas H. Thomas, *Pres.*

Dated July 16, 1916.                                    H. B. Wilcox, *Pres.*

After various meetings of the board of directors of the Merchants-Mechanics National Bank at which the proposed merger was considered favorably, the following resolutions were adopted at a special meeting of the stockholders of the Merchants-Mechanics National Bank on August 28, 1916:

Resolved, That the plan for merger of the Merchants-Mechanics National Bank of Baltimore and the First National Bank of Baltimore, dated August 16, 1916,[1] authenticated by the signature of Mr. Douglas H. Thomas, President, and submitted to this meeting, be and the same is hereby approved and the directors and officers of this bank be and they are hereby authorized and directed to take such proceedings, execute and deliver such instruments, and otherwise do whatever may be necessary or expedient to consummate and carry out said plan of merger.

The judges and tellers reported the vote on the resolution and the Chairman announced the same to be as follows:

Votes in favor of the resolution 146,217 shares, of which 97 shares were voted in person and the balance by proxy.

Votes against the resolution—None.

The resolution was thereupon declared adopted.

Upon motion of Mr. Stoneburner seconded by Mr. Appold the following resolutions were then passed:

Resolved, That the corporate name the Merchants-Mechanics National Bank of Baltimore is hereby changed to the Merchants Mechanics First National Bank of Baltimore; that to this end Section 6 of the Articles of Association be amended to be changed to read as follows: The Merchants-Mechanics First National Bank of Baltimore.

Resolved, That under the provisions of the Act of May, 1886, the capital stock of this association be increased in the sum of $500,000 making the total capital stock $2,500,000; divided like the outstanding stock into shares of the same par value.

Resolved, That this bank sell 50,000 shares of the par value of $10. each constituting the increase of its capital stock, authorized at a meeting held on the 28th day of August 1916, at $28. per share; the stock to be entitled equal and rateably with all stock heretofore issued to all dividends declared on or after this day: That the subscriptions to said stock be payable on the 11th day of September 1916, without interest, or upon such earlier or later date that the Board of Directors of this bank may on two days written notice require.

---

[1] Probably is a typographical error and should be July 16, 1916.

RESOLVED, That all stockholders of record August 26, 1916, be given an opportunity until September 6, 1916, to subscribe to said increase at said price rateably, i. e., and in proportion which the number of shares held by him on August 28, 1916 bears to the total number issued and outstanding on said day; that notice of said increase and limitation of the time for the exercise of said preferential right be given to all stockholders who have not heretofore waived said right, by mail posted on or before the 29th day of August, 1916. Subscriptions made in the exercise of said preferential right must be made in writing and delivered to the Cashier of the bank on or before three o'clock September 6, 1916, otherwise said preferential right shall lapse.

RESOLVED, That all shares of stock forming part of the increased issue of 50,000 shares of the par value of $500,000 with respect to which the right of preferential subscription may have been heretofore waived or may be hereafter waived or may not be exercised as and within the time herein limited may be sold by the Bank to Alex, Brown & Sons and to such stockholders of this bank and directors of this bank as may be associated with them in such purchase, at the price of $28. per share above stated.

RESOLVED, that the number of directors of this bank for the balance of the year 1916 or until the election and qualification of their successor be increased from sixteen, the number heretofore elected to twenty-two. This resolution shall not in any way alter or affect the provisions of the Articles of the Association providing that the Board shall consist of not less than five nor more than thirty stockholders.

RESOLVED, that this Bank purchase from the First National Bank of Baltimore all of the following property, to wit:

(1) All of the property of every nature and kind including good-will of the First National Bank of Baltimore (save as hereinafter excepted).

(2) The note or other obligation of $95,000 of the First National Bank of Baltimore or at its option of the persons or corporations to which the excepted assets may be conveyed.

The assets excepted from the sale consist of:

(a) The lot and improvements situated at No. 17 South Street and running through to Holliday Street, used as a banking house by the First National Bank of Baltimore.

(b) Commercial paper of the aggregate principal amount of $75,000 selected by the Merchants-Mechanics National Bank and specified on a list identified by the signatures of the President and Vice President or Cashier of this Bank and of said First National Bank of Baltimore.

That this Bank pay for said property as follows:

(a) That it assumes and pays all and every liability, including the obligations under every form of contract of said First National Bank of Baltimore.

(b) Pay to the First National Bank of Baltimore $1,400,000.00. Delivery and payment to be made on September 11th or on such earlier date as the two Banks may agree on.

The sale to be made as of September 11, 1916 and the property purchased and the liabilities assumed to be such as exist on said date. Said sale is made without representation or recourse.

RESOLVED FURTHER, that the Board of Directors and Officers of this Bank cause to be executed a formal contract for said purchase expressing the terms substantially as above stated and of such other provisions as said officers may approve.

And that said Board of Directors and Officers are hereby authorized and directed to execute such instruments and do whatever may be necessary or expedient to consummate said purchase.

Separate vote was taken on each resolution by ballot and in the case of each resolution the judges and tellers separately reported and the Chairman separately announced the vote.

In the case of each resolution there voted in favor of the adoption of the same stockholders holding 146,217 shares, of which 97 shares voted in person and 146,120 voted by proxy; and in the case of each resolution no shares were voted against the adoption of the same. In all cases the shares voted by proxy were voted by Messrs. Harlan and Rose, proxies as above stated.

Pursuant to these resolutions the following sales agreement was entered into between two banks:

### SALES AGREEMENT

THIS AGREEMENT, made this 29th day of August, 1916, by and between the First National Bank of Baltimore, party of the first part and the Merchants-Mechanics National Bank of Baltimore, party of the second part.

A plan for the merger of the Merchants-Mechanics National Bank of Baltimore and the First National Bank of Baltimore, dated July 16th, 1916, authenticated by the signatures of the Presidents of said Banks has been approved by the stockholders of each Bank, and the officers of each have been duly authorized to carry out and consummate the same.

Pursuant to said plan and by virtue of the authority conferred upon them respectively by due action of the stockholders, the First National Bank of Baltimore has agreed to sell and the Merchants-Mechanics National Bank of Baltimore has agreed to buy all of the assets of the First National Bank of Baltimore; to define and express this said agreement this instrument is executed.

NOW, THEREFORE, THIS AGREEMENT executed in consideration of the premises and of the sum of One Dollar and other valuable considerations by each of the said parties to the other paid, the receipt whereof is by them respectively acknowledged, witnesseth:—

FIRST: The First National Bank of Baltimore agrees to sell and deliver to the Merchants-Mechanics National Bank of Baltimore and the Merchants-Mechanics National Bank of Baltimore, agrees to purchase from the First National Bank of Baltimore, all of the following property, to wit:

(1) All of the property of every nature and kind, including good-will of the First National Bank of Baltimore (save as hereinafter expressly excepted).

*Commercial Paper excluded from the assets of the First National Bank purchased by the Merchants-Mechanics National Bank.*

| | |
|---|---:|
| Alice H. & Bonio H. Bittle, dated June 9, 1913   Payable six months after date_____ | $4,250. |
| Alice H. & Bonio H. Bittle, demand dated Oct. 18, 1913_____ | 800. |
| Easton Flint & Spar Co., J. B. Hanna, Jan. 31, 1916 four months after date, due May 3, 1916_____ | 493.27 |
| Lane Bros. Co. Sundry demand notes aggregating_____ | 50,895. |
| Charles N. Evans, demand note dated April 1, 1914 with sundry collateral _____ | 7,500. |
| Chas. T. Leviness, demand note dated March 5, 1913 with sundry collateral_____ | 3,425. |
| Woodlawn Cemetery Co. ⅓d interest St. Paul Plot Syndicate_____ | 7,608.33 |
| Balance of Jacob Foland note $39.80 endorsed by S. Kirson & Co. dated Nov. 8, 1915, 60 d, due Jan. 7, 1916_____ | 28.40 |
| | $75,000.00 |

(2) The note or other obligation for $95,000 of the First National Bank of Baltimore or at its option of any persons or corporations to which the excepted or reserved property may be conveyed as hereinafter provided.

The assets excepted from said agreement of said banks consisted of:

(a) The lot of ground and improvements situate at No. 17 South Street and running through to Holliday Street, Baltimore, Maryland, and used as a banking house by the First National Bank of Baltimore.

(b) Commercial paper of the aggregate principal amount of $75,000 selected by the Merchants-Mechanics National Bank of Baltimore and specified on a list attached hereto or identified by the signature of the President and Vice President or Cashier of each of said Banks.

SECOND. The Merchants-Mechanics National Bank of Baltimore agrees—

(a) To assume and pay all and every liability including the obligations under every form of contract of the First National Bank of Baltimore.

(b) To pay the First National Bank of Baltimore $1,400,000.00.

THIRD. The First National Bank of Baltimore retains said excepted or reserved assets free from all claims hereunder, save the payment of said obligation of $95,000. and interest at the rate of 4½ per cent per annum above referred to and no distribution of said reserved assets or the proceeds thereof shall be made to the stockholders of said First National Bank of Baltimore until said $95,000 shall have been paid. Said First National Bank of Baltimore may cause said assets to be transferred to individuals or to corporations for such consideration as it may see fit, provided that immediately upon such transfer such successor owner shall execute and deliver to the Merchants-Mechanics National Bank of Baltimore a note for $95,000, with an agreement that none of said property transferred shall be mortgaged or similarly encumbered without the consent of the holder of said note and upon such delivery all liability of said First National Bank of Baltimore or of its assets for the payment of said $95,000. shall be discharged and terminate.

FOURTH. Delivery and payments to be made on September 11, 1916, or on such earlier or later date as the Board of Directors of the Merchants-Mechanics National Bank of Baltimore and the Board of Directors of the First National Bank of Baltimore or its liquidating committee or agent may agree upon.

FIFTH. The sale is made as of September 11th, 1916, or as of such earlier or later date as may be so agreed upon for delivery. The property sold and to be delivered shall be the said property as it exists on said delivery date and the liabilities assumed shall be the liabilities as they exist on said delivery date. No change in title or right of possession shall take place and the right to conduct the business shall remain vested in the First National Bank of Baltimore until said 11th day of September, 1916, or until said substituted date for delivery as fully as if this agreement had not been made, save that no dividend shall be declared or paid on the stock of the said Bank before such date.

The purchaser has made such examination of the property so purchased as it desires and the sale is made without representation or recourse, and any change in its assets or liabilities, profits or losses now existing or occurring before said delivery date shall inure to the benefit of or be borne by the purchaser; it being intended that the said purchase price of $1,400,000, together with the proceeds of the retained assets (subject as to the reserved assets of the payment of $95,000) shall without deduction be available for distribution to the stockholders of the First National Bank of Baltimore as dividends in liquidation.

SIXTH. Proceedings for the change of the name of the Merchants-Mechanics National Bank of Baltimore have been begun and it is intended that the term

"Merchants-Mechanics National Bank of Baltimore" where herein expressed shall include also said Merchants-Mechanics First National Bank of Baltimore, save where the context shows that a different meaning is intended.

Appropriate resolutions to carry out the foregoing resolutions of August 28, 1916, and sales agreement (in so far as the Merchants-Mechanics National Bank was concerned) were adopted by the board of directors of the Merchants-Mechanics National Bank on August 29, 1916.

The sales agreement was carried out substantially as contemplated, with Alexander Brown & Sons, bankers, acting as Syndicate Managers. The stock of the First National Bank was selling on the market at this time at approximately $145 per share and that of the Merchants-Mechanics National Bank at $28 to $30 per share.

Prior to the merger, the Merchants-Mechanics National Bank took the necessary steps to have its name changed to the Merchants-Mechanics First National Bank of Baltimore, Maryland, and to secure the issuance of 50,000 additional shares of stock of a par value of $500,000. Under the terms of the merger, all of the stockholders of the First National Bank exchanged their stock for stock of the petitioner except a small minority to whom it was necessary to pay cash under the terms of the merger arrangement to the extent of $49,280. After the syndicate managers had secured all of the stock of the First National Bank, either by purchase for cash or exchange of stock for stock, the entire capital stock of the First National Bank was delivered to the petitioner. The petitioner, on September 11, 1916, took over all of the assets and assumed the liabilities of the First National Bank, except to the extent indicated in the sales agreement. The stock of the First National Bank was canceled and the First National Bank was liquidated.

On September 9, 1916, entries were made in the general books of the petitioner in accordance with the following statements:

1. Debits Alex. Brown & Sons, Syndicate Managers account at Merchants-Mechanics First National Bank, $1,400,000. payable to Merchants-Mechanics First National Bank upon delivery to Syndicate Managers of $500,000 par value of stock.

2. Merchants-Mechanics First National Bank gives cheque for $1,400,000 to Liquidating Committee, First National Bank.

3. Liquidating Committee deposits this cheque in Merchants-Mechanics First National Bank to account of Liquidating Committee.

4. Liquidating Committee orders its account charged in favor of Stockholders Committee First National Bank, $1,350,720 and proceeds to check out balance in favor of stockholders who do not exchange stock at $140.00 per share.

5. Stockholders Committee orders its account charged in favor of Alex. Brown & Sons, Syndicate Managers, for $1,350,720, Alex. Brown & Sons delivering stock to stockholders committee therefor.

On September 11, 1916, at a meeting of the board of directors of petitioner, the chairman of the board informed the board that under the plan of the merger the executive officers had agreed to appraise the assets of the petitioner, reducing the same to a conservative valuation and that there had been charged to profit and loss the sum of $641,590.36, which action was approved. The assets reduced were real estate, stocks and bonds, overdue paper, and demand and time loans and, in addition, one item called "Account good will First National Bank, $300,000.00."

At the time the merger took place, the First National Bank had been in business since 1863, and was one of the largest banks in Baltimore, that of the petitioner being the largest. It had always been successful and had paid dividends at the rate of 7 per cent. Its combined capital and undivided profits on September 9, 1916, was $1,105,745.36, which represented a conservative cash value of the tangible assets acquired. The bank building, which was included among the excepted assets, was not carried as an asset on the books of the First National Bank.

In order that the business as previously carried on by the First National Bank might be carried on in an uninterrupted manner by the petitioner, many of the officers and employees of the former bank were transferred to the latter and occupied similar positions with the petitioner. The president of the First National Bank became a director and executive officer of the petitioner and is now chairman of its board of directors. Depositors and customers of the First National Bank became depositors and customers of the petitioner.

No good will has ever been carried either on the books of the petitioner or those of the First National Bank. The failure to carry good will was not because of an absence of good will, but because of rulings by the Comptroller of the Currency which prohibited such a practice.

The value of the good will which the petitioner claims should be allowed in determining invested capital for the year on appeal is represented by the difference between the net worth of the First National Bank at the time of the merger, $1,105,745.36 and $1,400,000, the basis upon which the stock of the First National Bank was valued for the purposes of the merger. The reason for the disallowance as assigned by the Commissioner in the notice of deficiency was:

The restoration of good will for invested capital claimed to have been acquired in 1916 cannot be allowed for the reason that the evidence does not show that a reorganization took place and the stocks issued for the assets are presumed to represent the actual cash value of the assets so acquired. Further, there does not appear evidence to show that the transaction was a cash one.

OPINION.

LITTLETON : The contention advanced by the petitioner to the effect that it should be allowed to report a part of its income on the accrual basis when it is otherwise on the cash receipts and disbursements basis has previously been decided by the Board adverse to its contentions, *Appeal of Chatham & Phenix National Bank*, 1 B. T. A. 460; *Appeal of Bank of Hartsville*, 1 B. T. A. 920. In the *Appeal of Madison & Kedzie State Bank*, 1 B. T. A. 922, the Board said:

When a bank keeps its books of account on a cash basis, discount is income only when it is received; upon an accrual basis discount becomes income as it is earned.

We fail to find anything in the petitioner's argument as to consistency which would cause us to change our views previously expressed. *See Appeal of Henry Reubel*, 1 B. T. A. 676.

The second contention advanced by the petitioner is that the Commissioner erroneously refused to permit it to include good will in invested capital, which it acquired in the acquisition of the assets of the First National Bank through the merger of this bank and the petitioner in 1916.

The substance of the transaction in question is that after a basis of merger had been agreed upon, the entire capital stock of the First National Bank, $1,000,000, was acquired by the petitioner through an exchange of $500,000 additional stock issued by it. The exchange was handled through syndicate managers, with whom the additional stock was deposited and who made the exchange with the stockholders of the First National to the extent they elected to take stock, which all did except in the case of a small minority who elected to take cash and to whom it was necessary to pay cash in the amount of $49,280, which cash was obtained by the sale of a sufficient amount of the additional stock at $28 per share. After the stock was turned over to the petitioner, it effected a liquidation of the First National Bank and thereby became the owner of the assets of the First National Bank.

The Board is of the opinion that through the above transaction the petitioner acquired assets by the payment of tangible property therefor, viz., stock of the First National Bank. Prior to the time when liquidation was effected the petitioner was merely a stockholder, but after liquidation it was vested with full and complete ownership of the assets. *Appeal of Regal Shoe Co.*, 1 B. T. A. 896. In the aforementioned decision we said:

It is undoubtedly true, as appears from the resolution of January 31, 1907, that the taxpayer at all times intended to acquire the business and assets of the three predecessor corporations, but the fact is that before it acquired these assets it had acquired the stock which the statute characterizes as tangible

property, and the assets were acquired not for the stock of the taxpayer company but in liquidation of the stock of the other three corporations which it held.

In order to dispose of this issue, two remaining questions must be answered:

(1) What was the cash value of the assets paid in?

(2) Was good will of a value of $294,254.64 paid in?

It does not seem that there can be much question that the entire assets paid in had a value at least equal to $1,400,000, the amount claimed therefor by the petitioner. While we do not have a specific cash valuation of the assets themselves, we do have an undisputed market value of the stock of both the buyer and the seller at the time of the merger. The market value of the stock of the former was $145 and was considered in the merger at $140, while the market value of the stock of the petitioner was from $28 to $30 and was considered in the merger at $28. Whether we take the 10,000 shares of the former at $140 or 50,000 shares of the petitioner at $28, we arrive at a total value in each instance of $1,400,000 which is the valuation claimed by the petitioner. Whether the market value of the petitioner's stock was the same after the additional issue of stock is not definitely stated, though convincing evidence of its value then is shown by the fact that in its issuance the stockholders of the First National Bank, except a very small minority, willingly exchanged their stock for the new stock, when under the term of the merger they could have taken cash instead of stock. We consider the evidence sufficient to establish the cash value of the assets of the First National Bank at the time paid in to the petitioner of at least $1,400,000.

The remaining question is whether good will of a value equal to the difference between the net book value of the First National Bank when acquired or $1,105,745.36, and the $1,400,000 found above, represents good will.

The following paragraph from the sales agreement under which the merger took place and which refers to the assets to be taken over shows that whatever good will the First National Bank had and was capable of transfer, was acquired by the petitioner:

All of the property of every nature and kind, including good will of the First National Bank of Baltimore, (save as hereinafter expressly excepted.)

A national bank is capable of having good will as an asset and this has been recognized by the Commissioner, I. T. 1995, C. B. 111–1, p. 145.

The failure of either bank to carry good will on its books is explained by the rulings of the Comptroller of the Currency, which prohibit the showing of any good will upon a financial statement of a national bank. That the petitioner immediately charged off the good

will which it considered was acquired in the merger is ascribable to the same reason as a failure to carry good will on its books.

That a bank which has been in business since 1863, had been paying dividends at the rate of 7 per cent on its capital stock, and had grown to the position of one of the leading banks in Baltimore, Md., did not thereby build up an intangible asset of substantial value—whether we call it going concern value or good will value is not material—does not impress the Board as tenable. The substantial line of deposits which came over to the petitioner was certainly of value. The further fact can not be overlooked that many of the officers and employees of the First National Bank came along to occupy similar positions with the petitioner, so that old customers would be assured of the same treatment accorded heretofore.

The further fact must not be overlooked that we are dealing with a national bank which is under strict Government supervision. When at any time tangible assets are being carried in excess of conservative valuation, the United States will require that the proper valuation be placed on the assets. This would indicate that the tangible assets as taken over by the petitioner were considered on a conservative present value at the time taken over.

Value of good will is a question of fact and a taxpayer claiming a value for good will must prove facts sufficient to show value thereof at date of acquistion. *Appeal of Schulz Baking Co.*, 3 B. T. A. 470.

It is very difficult to establish the exact cash value of the intangible asset good will, but the Board is convinced from a consideration of all the evidence, that a valuation of intangibles based upon the difference between the net book value of the tangibles at date of acquisition, $1,105,745.36, and the amount paid therefor, $1,400,000, is fair and reasonable, and to this extent the appeal of the petitioner is sustained. This amount is, of course, not subject to the usual limitations of acquisition of intangibles for stock since tangible assets of an equivalent cash value were given therefor.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

PHILLIPS concurs in the result only.